843 So.2d 774 (2002)
R.K. and C.K.
v.
R.J.
2000526.
Court of Civil Appeals of Alabama.
September 6, 2002.
*775 Gregory M. Varner, Ashland, for appellants.
Donald R. Hamlin, Ashland, for appellee.
MURDOCK, Judge.
In July 2000, R.J. filed a petition in the Clay County Juvenile Court seeking custody of T.S.K, a minor child. Among other things, the petition alleged that in 1997, R.J. had been adjudicated the father of T.S.K. in a paternity proceeding brought by the child's mother, K.K.; that the mother had formally relinquished custody of the child to C.K. and R.K. (the child's maternal grandparents) in an August 1999 judicial proceeding of which R.J. had not received notice; and that under Ex parte Terry, 494 So.2d 628 (Ala.1986), he was entitled to custody of the child. The juvenile court awarded R.J. (hereinafter "the father") and the maternal grandparents joint custody of the child pendente lite and vacated its previous judgment awarding custody of the child to the maternal grandparents.
After an ore tenus proceeding, the juvenile court entered a judgment awarding the father custody of the child and granting the mother visitation under the supervision of the maternal grandparents. In its judgment, the juvenile court stated its reasons for awarding custody of the child to the father:
"The father of the minor child is not an unfit person to have custody, nor has he voluntarily relinquished his right of custody of the minor child. See Ex parte D.J., 645 So.2d 303 (Ala.1994).

"While this Court respects and highly commends the maternal grandparents for their unselfish efforts in caring for the minor child, nevertheless, the father, *776 having been determined not to be unfit, is entitled to custody as a matter of law, as against the maternal grandparents.... Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte D.J., supra."

(Emphasis added.)
The maternal grandparents appeal from the judgment awarding the father custody of the child.[1] The mother has not appealed. This court's review of the trial court's judgment is governed by the following standard set forth by our Supreme Court:
"Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court.
"`[O]ur standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.'"
Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994) (citations omitted; quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ. App.1993)). However, "[q]uestions of law are not subject to the ore tenus standard of review," Reed v. Board of Trustees for Alabama State University, 778 So.2d 791, 793 n. 2 (Ala.2000), and a trial court's conclusions on legal issues carry no presumption of correctness on appeal. Ex parte Cash, 624 So.2d 576, 577 (Ala.1993).
In a child-custody case, the primary concern is the best interests and welfare of the child. E.g., McKinney v. Alabama Dep't of Pensions & Sec., 475 So.2d 568 (Ala.Civ.App.1985); Price v. Price, 440 So.2d 1110 (Ala.Civ.App.1983); Dale v. Dale, 54 Ala.App. 505, 507, 310 So.2d 225, 227 (Ala.Civ.App.1975). Indeed, our law's long-standing recognition of a presumption of custody in favor of a natural parent has always been premised upon the best interests of the child:
"The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for."
Striplin v. Ware, 36 Ala. 87, 89 (1860) (quoted with approval in Ex parte D.J., 645 So.2d 303, 305 (Ala.1994)).
It is on the basis of the principles reflected in Striplin v. Ware that our courts have articulated a "prima facie right" on the part of a natural parent to the custody of his or her child. As our Supreme Court explained in Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983), this "prima facie right of a natural parent to the custody of his ... child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right... is in the best interest ... of the child as a matter of law." See generally Jackson v. Farmer, 247 Ala. 298, 300, 24 So.2d 130, 132 (1945) (recognizing that "the prima facie right to the custody of a child is always in the parents over all other persons is well-nigh universally recognized," *777 "[b]ut it is equally well established that this prima facie right of the parent is not an absolute one, but that the question of prime importance is the welfare of the child, which becomes the ward of the court").
It was thus toward the end of serving the best interests and welfare of the child that our Supreme Court stated in Ex parte Terry that the prima facie right of a natural parent to the custody of his or her child is such that "`absent a showing of voluntary forfeiture of that right, ... [that right] can be overcome only by a finding... that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" Ex parte Terry, 494 So.2d 628, 632 (Ala.1986) (quoting Ex parte Mathews, 428 So.2d at 59).
The "voluntary forfeiture" exception to a natural parent's prima facie right to custody recognizes that a parent's voluntary forfeiture of his or her child tends to rebut the presumption that the parent in question will best provide the love, care, security, and upbringing the child needs. Concomitantly, it is a reflection of the well-established principle that "ties of affection resulting from years of association between the child and its custodian" are relevant to a determination of the child's best interests. See generally Dale v. Dale, 54 Ala.App. 505, 507, 310 So.2d 225, 227 (Ala. Civ.App.1975); McGrady v. Brown, 230 Ala. 484, 161 So. 475, 476 (1935) ("`relinquishment of ... custody to another and continued acquiescence therein are matters to be considered by the court in determining the question of prime importance the welfare of the child'") (quoting Payne v. Payne, 218 Ala. 330, 331, 118 So. 575, 576 (1928)). As this court explained in Borsdorf v. Mills:
"To tear [a child] from his home and those he knows as his parents and the source of love, safety and security merely to give sanction to a principle of priority of right is unconscionable. The principle of priority of right of a parent to custody is founded upon the premise that because of a blood relation and instinct, such parent will better love and care for a child than one not so related. Such premise may be theoretically correct but practical experience has often proved it incorrect. The bonds of love between parent and child are not dependent upon blood relation and instinct, but may be forged as strongly in the crucible of day to day living. Out of the actual relationship of parent and child love grows. It is not merely a product of the biological function of conception and giving birth. To give paramount consideration to the principle of parental priority or ownership in custody decisions would often be an anathema to the best interest of the child."
49 Ala.App. 658, 661-62, 275 So.2d 338, 341 (Ala.Civ.App.1973) (quoted in part with approval in Brill v. Johnson, 293 Ala. 435, 437, 304 So.2d 595, 597 (Ala.1974) (Bloodworth, J., concurring specially, and joined by five members of the Court)).[2]
Our Supreme Court explained in Ex parte McLendon, 455 So.2d 863 (Ala. 1984), that:

*778 "A natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary forfeiture of custody."

455 So.2d at 865 (emphasis added). The McLendon court also recognized that a parent's prima facie right to custody does not apply if the parent's unfitness is reflected in a "decree removing custody from the natural parent and awarding it to a nonparent." 455 So.2d at 865.[3] Thus, if the natural parent has abandoned his child, or custody has been awarded to a nonparent, the question of what custodial arrangement thereafter will be in the child's "best interest" is examined without a presumption in favor of the parent.
Further, where there has been a voluntary forfeiture of a child or a judgment awarding custody of the child to a nonparent, and the custodian has "`acted upon'" his or her newfound custody "`to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [he] can show that a change of the custody will materially promote [his] child's welfare.'" 455 So.2d at 865 (quoting Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1976)) (emphasis added). As the McLendon Court explained, this heightened burden of proof on the natural parent is based upon a "`rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood.'" 455 So.2d at 865 (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)).[4]
In the present case, the grandparents contend first that the juvenile court erred in giving the father the benefit of the parental presumption described in Terry. The grandparents argue that the father abandoned, or voluntarily forfeited, the child and therefore lost his prima facie right to custody. The grandparents further argue, in essence, that they have "acted upon" the father's forfeiture "to the manifest interest and welfare of the child" in that they have provided a loving and secure home for the child. Thus, according to the grandparents, not only should the father not have the benefit of a Terry presumption, he should not be allowed to uproot the child without satisfying the heightened "material-promotion" standard established in Ex parte McLendon.
The record reveals that the father entered the United States Navy and left Alabama, after having been informed that he had impregnated the mother. The child was born out of wedlock in 1994, six months after the father entered the Navy. The mother and the child lived with the maternal grandparents sporadically for the first four years of the child's life.
The mother brought a paternity action against the father in 1997. On May 8, 1997, R.J. was adjudged, by default, to be the biological father of the child. The trial court thereupon issued an order to the father's employer requiring it to withhold monthly child-support payments from the father's paychecks.
*779 After being discharged from the Navy, the father entered civilian employment, but he continued to have no physical contact or relationship of any nature with the child. Nor did the father ever write a letter to the child, contact the child by telephone, or send a Christmas or birthday present. The father showed little or no interest in the child until February 2000.
The father testified at trial that he had another child living in Clay County, the mother of whom was a woman other than K.K. The father testified that he had visited that child at least twice a year during the last two to three years. He stated that once or twice, while otherwise visiting in Alabama, he went to one of K.K.'s former residences in an effort to locate her. He admitted on cross-examination that he knew some of K.K.'s family living in Clay County. He also admitted that he could not remember the locations of the residences at which he had "looked" for K.K. and the child, and that he had not looked in the local telephone directory for information. Although child-support payments were being withheld from the father's paycheck pursuant to a court order, the father made no effort during this time to inquire as to the address to which those payments were being sent. Nor did the father make any other efforts to locate his child following K.K.'s successful 1997 paternity suit against him.[5]
The mother and the child moved into the maternal grandparents' home on a permanent basis in April 1998. In May 1999, the mother relinquished exclusive physical custody of the child to the maternal grandparents. The maternal grandparents thereafter filed a custody petition and in August 1999 were awarded custody of the child by the trial court.[6]
In February 2000, the mother located the father by conducting an Internet search and contacted him to determine his interest in visiting with the child. Until that time, the child, who by then was approximately six years old, had never seen nor spoken with the father. As a result of the mother's initiation of contact with the father, the child has visited with the father at his home in Texas on two occasions for several weeks.
The trial court appointed a guardian ad litem who reported to the court, among other things, that the child had formed a "significant bond" with his maternal grandparents. The guardian ad litem recommended that the child, who suffered from severe psychological and behavioral problems, be placed in the custody of the maternal grandparents and that the father be awarded liberal visitation rights. In its judgment, the trial court stated that it "respect[ed] and highly commend[ed] the maternal grandparents for their unselfish efforts in caring for the minor child."
The grandparents asserted that the father's conduct in failing to contact the mother and the child for approximately six years, until the commencement of this litigation, constituted a "voluntary forfeiture." The trial court rejected that argument. Even as it commended the efforts of the grandparents in raising the child, the court expressly relied upon Ex parte D.J. to conclude as a matter of law that the father had not voluntarily relinquished custody of the child. The court stated that the father, "having been determined not to be unfit, is entitled to custody as a matter of *780 law, as against the maternal grandparents.... Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte D.J., supra."
In Ex parte D.J., although the father of an illegitimate child knew of the child's existence and had abandoned the child, our Supreme Court held that there had been no "voluntary forfeiture" for purposes of the natural father's presumptive claim to custody. The court reasoned that during the years the father had forfeited physical custody of the child, he had taken no steps to be adjudicated as the child's father and, therefore, could successfully assert that he had no legal right to custody of the child during that time. Without such a right, the D.J. court further reasoned, there could be no "voluntary forfeiture." 645 So.2d at 306-07.
The trial court in the present case awarded custody of the child to the father as a matter of law based on a coupling of the holdings in Ex parte Terry and Ex parte D.J. Because it had found the father not to be "unfit,"[7] the trial court considered itself to be bound by Terry's presumption in favor of the natural father unless it found there to have been a voluntary forfeiture. Because the father's paternity, though undisputed, had not been adjudicated during part of the six years in question, the trial court considered that it was foreclosed by Ex parte D.J. from making a finding of voluntary forfeiture.
We note a tension between our Supreme Court's holding in Ex parte D.J. and the principles reflected in Borsdorf and the other cases discussed above. We also note that these latter principles are likewise reflected in federal constitutional jurisprudence.
In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the United States Supreme Court began its analysis by explaining that state law "almost universally" expresses an appropriate preference for the formal family, but that in some cases the United States Supreme Court has held that the federal constitution provides even greater protection for certain formal family relationships:
"In some cases, however, this Court has held that the Federal Constitution supersedes state law and provides even greater protection for certain formal family relationships. In those cases, as in the state cases, the Court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed. Thus, the `liberty' of parents to control the education of their children that was vindicated in Meyer v. Nebraska, 262 U.S. 390[, 43 S.Ct. 625, 67 L.Ed. 1042] (1923), and Pierce v. Society of Sisters, 268 U.S. 510[, 45 S.Ct. 571, 69 L.Ed. 1070] (1925), was described as a `right, coupled with the high duty, to recognize and prepare [the child] for additional obligations.' Id., at 535[, 45 S.Ct. 571]. The linkage between parental duty and parental right was stressed again in Prince v. Massachusetts, 321 U.S. 158, 166[, 64 S.Ct. 438, 88 L.Ed. 645] (1944), when the Court declared it a cardinal principal `that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Ibid. In these cases the Court has found that the relationship of love and duty in a recognized family unit is *781 an interest in liberty entitled to constitutional protection. See also Moore v. City of East Cleveland, 431 U.S. 494[, 97 S.Ct. 1932, 52 L.Ed.2d 531] (1977) (plurality opinion)."
Id. at 257-58, 103 S.Ct. 2985.
Accordingly, the United States Supreme Court recognized in Lehr that "`[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' " Lehr, 463 U.S. at 260, 103 S.Ct. 2985 (quoting Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)). As the Lehr Court noted,
"Commentators have emphasized the constitutional importance of the distinction between an inchoate and a fully developed relationship. See Comment, 46 Brooklyn L.Rev. 95, 115-116 (1979) (`the unwed father's interest springs not from his biological tie with his illegitimate child, but rather, from the relationship he has established with and the responsibility he has shouldered for his child'); Note, 58 Neb.L.Rev. 610, 617 (1979) (`a putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights ... will remove from him the full constitutional protection afforded the parental rights of other classes of parents'); Note, 29 Emory L.J. 833, 854 (1980) (`an unwed father's rights in his child do not spring solely from the biological fact of his parentage, but rather from his willingness to admit his paternity and express some tangible interest in the child')."
Lehr, 463 U.S. at 261, n. 17, 103 S.Ct. 2985. The Court therefore further recognized that an unwed father's demonstration of commitment to his child is determinative of his due-process rights:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' Caban [v. Mohammed], 441 U.S. [380,] 392[, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) ], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he `act[s] as a father toward his children.' Id., at 389, n. 7[, 99 S.Ct. 1760]. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. `[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children ... as well as from the fact of blood relationship.' Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844[, 97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14] (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233[, 92 S.Ct. 1526, 32 L.Ed.2d 15] (1972))."
Lehr, 463 U.S. at 261, 103 S.Ct. 2985 (emphasis added; footnote omitted).
Conversely, when an unwed father fails to "come forward," he will not acquire substantial constitutional protection:
"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. *782 If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."
Lehr, 463 U.S. at 262, 103 S.Ct. 2985 (footnote omitted). See also M.V.S. v. V.M.D., 776 So.2d 142, 146 (Ala.Civ.App.1999) (relying on Lehr for the proposition that a biological father must have a "substantial relationship" with a child in order to have a constitutional right to withhold consent to that child's adoption).
Here, the unwed father clearly did not step forward when he could have. The courts of this State therefore are under no obligation to accord the father full United States Constitutional protection of his parental rights. In the eyes of federal jurisprudence, providing such protection would be inconsistent with the best interests of the child, given the father's lack of any substantial relationship with the child.[8]
The State of Alabama, however, may be free to make a different judgment as to what would be in the best interests of children who have been abandoned by their biological fathers. The State may decide, insofar as state law is concerned, that the physical abandonment of a child by an unwed, biological father (in contrast to such father's abandonment of adjudicated paternity rights), should not prevent such a father from being on an equal presumptive footing with a fit, custodial motherand on better footing than all other parties, regardless of their historical relationships with the childrenif and when such a father's paternity is eventually adjudicated.[9] Indeed, Ex parte D.J. appears to do that. There is therefore an unavoidable tension between the holding of Ex parte D.J. and the principles reflected in Lehr and the state authorities other than Ex parte D.J. discussed above.[10]
*783 Nonetheless, this court, as was the trial court, is bound by the holding of Ex parte D.J. However, that holding is not dispositive in the present case. The paternity of the father in this case did not remain unadjudicated throughout the entire time he continued his forfeiture of the child.
R.J. was adjudicated as the father of the child in 1997, more than three years before he petitioned for custody. Ex parte D.J. does not foreclose a finding that a man who has been adjudicated to be the father of a child has, by his post-adjudication neglect of a child, voluntarily forfeited his custodial rights. The juvenile court's conclusion that the father did not abandon the child "as a matter of law" is therefore incorrect as to the period between 1997 and the filing of the father's July 2000 custody petition.
Moreover, there was substantial evidence in this case indicating that the father, following his 1997 adjudication as the father of the child, made scarcely any effort to contact the child or the child's family, and that the father was a complete stranger to the child until the mother found the father in February 2000 and initiated contact with him. Indeed, because there is no substantial evidence to the contrary, we conclude that the father did voluntarily forfeit custody of his child after his 1997 adjudication and that the maternal grandparents accepted custody of the child during this same period and acted on such custody to the manifest interest and welfare of the child. We therefore must reverse the judgment of the juvenile court and remand the cause for that court to determine whether the father met the McLendon burden of proving that a transfer of custody to him at this juncture would materially promote the best interests of the child.[11]
The dissent takes the position that the custody award in this case affected only the natural father's right to custody vis-à-vis the mother. This is true insofar as it goes. However, it is not the custody award that causes the father in this case to lose his presumptive custodial right as against someone other than the mother, it is the father's conducthis abandonment of his child. The father never stepped forward as the child's father. He never attempted to obtain any visitation rights; he never made any contact with the child until the mother finally contacted him just before this litigation began. While there was a court-ordered garnishment of child support from the father's wages after he defaulted in a 1997 paternity suit, the father's complete absence from his child's life otherwise continued as fully as before that paternity suit.
*784 The period after the paternity suit might be viewed differently had the father come into court in 1997 and accepted his responsibilities as to the child and sought visitation rights, and then fulfilled those responsibilities and exercised those rights so as to establish a relationship with his child. Had he done so, the father would now be in a position to argue that he had stepped forward and fulfilled his parental role by acting as the child's parent to the extent circumstances allowed. But he did not do this. He rejected this role. He thus abandoned his child. He did so indefinitely, without any manifest concern or regard for where or with whom the child was living or how the child was fairing.[12] It is this general abandonment from and after 1997 that constitutes a voluntary forfeiture and deprives the father of the prima facie right to custody he otherwise would enjoy as the natural parent. See Ex parte Mathews, 428 So.2d 58 (Ala.1983); Ex parte Terry, 494 So.2d 628 (Ala.1986); Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (Ala.Civ.App.1973). See also Lehr, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See generally Ala.Code 1975, § 26-18-3(1) (defining "abandonment" for purposes of Alabama's Child Protection Act).
The dissent relies in part upon Ex parte Berryhill, 410 So.2d 416 (Ala.1982). In Ex parte Berryhill, a child's father had lost custody to the child's mother in a prior custody determination that had been made without any finding that the father was unfit. The Supreme Court held that in a subsequent custody determination, the father would remain entitled to a custodial presumption against third parties, subject to the outcome of a determination on remand as to whether the father was unfit. The Berryhill court, however, did not address the concept of an abandonment or a "voluntary forfeiture" as a potential separate ground for the loss by a parent of his or her prima facie custodial right.
The Court of Civil Appeals' decision in Berryhill v. Berryhill, 410 So.2d 413 (Ala. Civ.App.1981), was reversed, and the case was remanded, because the Supreme Court simply concluded that this court had applied the wrong legal standard regarding the parent's fitness. Specifically, the Supreme Court was concerned that this court, rather than respecting the prima facie right of the natural parent by merely inquiring as to whether the natural parent was fit, had gone a step further and had erroneously inquired into who, as between the natural parent and the nonparent, was "the fittest of the two for custody of the child." Ex parte Berryhill, 410 So.2d at 417 (emphasis added).[13]
*785 The Supreme Court's decision in Ex parte Berryhill was not inconsistent with the principle that a parent who abandons his child loses his prima facie right to the custody of that child. The Supreme Court neither disapproved of Borsdorf nor disparaged the concerns expressed in that opinion. Indeed, the same concerns expressed by this court in Borsdorf underlie the principle recognized in Ex parte Terry, Ex parte McLendon, and Ex parte Mathews, all of which were decided after Ex parte Berryhill, that voluntary forfeiture does cause a parent to lose his or her presumptive right to custody. Rather, the opinion in Ex parte Berryhill was merely focused upon whether this court had mistakenly considered whether the natural father was the fittest of the two parents seeking custody, instead of simply whether the natural father was fit. The issue of abandonment, or voluntary forfeiture, as a separate ground for a natural parent's loss of his prima facie right to custody was not addressed in Ex parte Berryhill. For that matter, nothing in Ex parte Berryhill prevented the abandonment of the child from being considered on remand as evidence of the father's "unfitness."[14] Moreover, Supreme Court decisions subsequent to Ex parte Berryhill repeatedly have recognized that unfitness and voluntary forfeiture constitute two separate, albeit related, grounds for loss of the parental presumption of custody. See, e.g., Ex parte R.C.L., 627 So.2d 920, 921 (Ala.1993) (treating "voluntary forfeiture of custody" and "prior decree removing custody from the natural parent and awarding it to a nonparent" as two separate and independent grounds recognized by Ex parte McLendon for overcoming the prima facie right of a natural parent to custody of his or her child); Ex parte Terry; Ex parte McLendon; Ex parte Mathews.[15]
Citing Ex parte Terry, 494 So.2d 628, 632 (Ala.1986), the dissent also states that "the contest [here] is not between the [father] and a person to whom [the father] has transferred [custody by fair agreement] or [by a prior judgment]." "Accordingly," the dissent states, "under Terry, the father does not have to meet the McLendon standard to `reclaim' custody as against the grandparents."
*786 Because McLendon was a case in which there was a prior judgment based upon a "fair agreement" of the parties to transfer custody of a child to another, the McLendon court stated:
"The correct standard in this case is:
"`Where a parent has transferred to another [whether it be a non-parent or the other parent], the custody of h[er] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'"
455 So.2d at 865 (emphasis added); quoting Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947). The McLendon standard has not been limited, however, merely to cases in which the custody arrangement being challenged is the result of a "fair agreement." As we have noted, the McLendon court, itself, explained: "A natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary forfeiture of custody or a prior decree removing custody from the natural parent and awarding it to a nonparent. Ex parte Mathews, 428 So.2d 58 (Ala. 1983)." 455 So.2d at 865 (emphasis added) (cited with approval in Ex parte Terry). See also, e.g., Ex parte R.C.L.
Ex parte Terry was not a case in which the father had voluntarily forfeited custody as did the father in the present case. Instead, in Terry, a prior divorce judgment had placed physical custody of the child with its mother. Within just "a few months" of the mother's subsequent transfer of physical custody of the child to the grandparents, the father stepped forward to seek custody and assert his role as the natural parent. In the context of these facts, it is noteworthy that, immediately before the Terry opinion's quotation of the "fair agreement" language of Ex parte McLendon, the Supreme Court also stated that
"neither of the conditions to the nonapplication of the presumption in favor of a parent, which this Court enumerated in Ex parte McLendon, occurred in the present case: Petitioner did not voluntarily forfeit custody, nor did the prior decree award custody to a nonparent, as was the case in Ex parte McLendon."

Ex party Terry, 494 So.2d at 632 (first emphasis added).
In light of the foregoing, the judgment of the juvenile court is reversed, and this case is remanded for a determination by the trial court based upon the record before it as to whether the father satisfied the McLendon standard by proving that a transfer of custody to him would materially promote the interest and welfare of the child.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON and PITTMAN, JJ., concur.
YATES, P.J., concurs in the result.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
I must respectfully dissent. The majority holds that the father has voluntarily relinquished custody of his child and that, in order to reclaim custody, he must meet the Ex parte McLendon, 455 So.2d 863 (Ala.1984), standard. I disagree. In fact, it appears from the record that the father lost his parental presumption vis-à-vis the mother when she was awarded custody in the paternity judgment. However, the "contest [here] is not between the [father] and a person to whom [the father] has *787 transferred [custody] ... by fair agreement [or by prior judgment]." Ex parte Terry, 494 So.2d 628, 632 (Ala.1986) (internal quotations and citation omitted). Accordingly, under Terry, the father does not have to meet the McLendon standard to "reclaim" custody as against the grandparents. Similarly, Ex parte Berryhill, 410 So.2d 416 (Ala.1982), the facts of which are quite similar to the present case, stands for the proposition that when a father is not awarded custody of a child, he is still given the benefit of the parental presumption against third parties, provided he is not found unfit.
I also believe that Ex parte D.J., 645 So.2d 303 (Ala.1994), requires that the trial court's judgment be affirmed. The D.J. court found that "application of the parental presumption in [cases like this one] promotes the sound policy of encouraging fathers to fulfill their paternal roles." Ex parte D.J., 645 So.2d at 306. The father in this case, once he discovered the mother's unfitness, chose to assume his paternal role. I must dissent from the majority's reversal of the trial court's application of the principles espoused by our supreme court in Ex parte D.J., Ex parte Terry, and Ex parte Berryhill.
NOTES
[1] This court has jurisdiction to hear the appeal because the juvenile court has certified the record as adequate for appellate review. See Rule 28(A), Ala. R. Juv. P.
[2] We do not directly rely upon Borsdorf for the result reached in this case. We do, however, quote from Borsdorf because it is a case that well articulates principles relating to the relative importance of stability in a child's environment and the child's relationships with those who have cared for and loved it, in comparison to a child's biological ties with a natural parent when the latter has made himself a stranger to the childprinciples that inform subsequent decisions of our Supreme Court.
[3] It is the latter ground, i.e., a prior decree removing custody from the natural parent, upon which the mother's superior right to custody was lost in McLendon. McLendon, 455 So.2d at 865.
[4] Thus, in order to overcome the McLendon presumption in favor of the new custodian, the natural parent must prove that "`[t]he positive good [to be] brought about by the modification [of custody will] more than offset the inherently disruptive effect caused by uprooting the child.'" Ex parte McLendon, 455 So.2d at 865 (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)).
[5] In contrast, the record reflects that when the child inquired about his father, the mother was able to quickly locate the father by using the Internet.
[6] As has been noted, this custody award was vacated by the trial court in July 2000 after the father filed his petition for custody.
[7] Compare D.C. v. C.O., 721 So.2d 195 (Ala. Civ.App.1998) (upholding trial court finding of the natural father's unfitness based upon the father's abandonment, or forfeiture of actual physical custody, of the child, for a period of seven years, even though the father was not adjudicated to be the father of that child during the period of forfeiture).
[8] In addition, to the extent that one objective of the law is to encourage fathers to step forward and to act as such, it would not seem that extending custodial protection to a biological father after he has abandoned his child for a period of years would provide the right incentive for the father with respect to whether he will abandon the child in the first place.
[9] Nothing would appear to prevent an unwed, biological father who has abandoned his child from seeking an adjudication of his paternity at the same time he decides to seek custody of that child.
[10] As noted, Ex parte D.J. focuses on the existence, or abandonment, of legal rights by a biological father of a child born out of wedlock, rather than the abandonment of a relationship or actual physical custody that occurs when a father absents himself from his child's life for an extended period. The adverse impact to a child of a relational or physical abandonment by the child's father would appear to be the same regardless of whether the father was formally adjudicated as the child's father before absenting himself from his child's life. Likewise, the potential trauma to a child of severing the child's relationship with those with whom, in the wake of an abandonment by his father, the child has long since formed deep emotional and psychological bonds and sending the child to live with a man who is a stranger to the child, would appear to be the same regardless of whether the man to whom custody is to be transferred was formally adjudicated to be the biological father before he abandoned the child or just prior to the contemplated custody transfer.

Even within the context of a focus on the legal rights of an unwed father, however, it may be noted that the reasoning in Ex parte D.J., itself, was premised upon the "`strong presumption in Alabama, which has not been modified or abolished either judicially or legislatively, that the mother of a child born out of wedlock has a superior right of custody over all other persons,'" 645 So.2d at 307, and that this presumption pertains to the primary physical custody of the child. Thus, even when a child is born out of wedlock, a biological father generally still has a right to bring an action to confirm his paternity of the child, see Ala.Code 1975, § 26-17-1 et seq., and, even if primary custody of the child is maintained with the mother, seek the right to visit or otherwise begin a relationship with the child. Cf. Lehr v. Robertson, 463 U.S. at 261, n. 17, 103 S.Ct. 2985 (noting with approval a commentator's statement that "`a putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights ... will remove from him the full constitutional protection afforded the parental rights of other classes of parents'" (emphasis added)).
[11] Citing D.C. v. C.O., the maternal grandparents also argue that the acts and omissions of the father during the first six years of the child's life demonstrate his "unfitness" under Ex parte Terry. The father responds by emphasizing evidence of his current fitness, including his role as a father in the family he now maintains in Texas. The grandparents' argument, in essence, is that the father's actions demonstrate his unfitness to be the father of the particular child at issue in this case. See, e.g., D.C. v. C.O., 721 So.2d at 198-99. We need not reach this issue in light of our conclusions regarding the father's voluntary forfeiture of the custody of the child.
[12] This is not a case where a parent, acting out of love and concern for his child, turned over custody of the child to another for a temporary period for the sake of the child's welfare. This court and our Supreme Court have refused to discourage temporary custodial arrangements during necessitous times. See, e.g., Ex parte Couch, 521 So.2d 987 (Ala. 1988); Curl v. Curl, 526 So.2d 26 (Ala.Civ. App.1988); M.D.K. v. V.M., 647 So.2d 764 (Ala.Civ.App.1994).
[13] The Supreme Court's conclusion in Berryhill that the Court of Civil Appeals had applied the wrong legal standard was, in part, a function of "[t]he references of the Court of Civil Appeals to the father's age and present financial condition," which the Supreme Court held did not establish that the natural father was "unfit or unsuited" to receive custody of the child. 410 So.2d at 417. The Supreme Court emphasized the nature of its concern over the legal standard applied by the Court of Civil Appeals by heavily relying upon Ex parte Sullivan, 407 So.2d 559 (Ala. 1981), a case in which the Supreme Court concluded "that the probate judge did not observe [the] presumption, which under our law favors the natural parent." 407 So.2d at 564. Indeed, in Ex parte Sullivan, "[t]he entire record [wrongly] focuse[d] on the relative affluence of the [third parties] as compared to that of the natural [parent]." Id. Likewise, the Supreme Court in Ex parte Berryhill also relied upon Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910 (1955), a case in which the lower court was reversed with the admonition that:

"`Merely because some other person may be more fit should not be a basis for defeating the parent's natural right. If without finding the parent unfit the general conclusion is reached that the best interests of the child require that a stranger be his custodian, the necessary hypothesis is that although the parent was fit, the court decided someone else was more fit. That means that the state acting through its courts may completely eliminate all parental rights.'"
Griggs v. Barnes, 262 Ala. at 364, 78 So.2d at 917 (emphasis added; quoting Guardianship of Smith, 255 P.2d 761, 762 (Cal.1953)).
[14] See, e.g., D.C. v. C.O., supra.
[15] We take care not to construe the Supreme Court's opinion in Ex parte Berryhill in such a manner as to attribute to that court consideration and rejection of principles that not only were not discussed in that opinion, but that were articulated in cases decided after Berryhill. While it is true that, in Berryhill, the father had not seen his son for four years before the trial court's judgment, as noted, neither this court nor the Supreme Court addressed the issue of "voluntary forfeiture" as an independent ground for the loss of a natural parent's prima facie right to custody. The focus of the Supreme Court in Ex parte Berryhill was on correcting the lower court's use of a comparative-fitness standard rather than an absolute standard. Moreover, it was during the following year that the Supreme Court, in Ex parte Mathews, 428 So.2d 58 (Ala.1983), articulated as two separate exceptions to the paternal-custody presumption the twin concepts of unfitness and voluntary forfeiture.